Kevin ARMSTRONG et al., Plaintiffs,

v.

Donald J. O'CONNELL et al.,
Defendants,

Milwaukee Teachers' Education Association, Undesignated Intervenor.

Civ. A. No. 65–C–173.

United States District Court,
E. D. Wisconsin.

March 17, 1977.

Lloyd A. Barbee, Milwaukee, Wis., for named plaintiffs.

Irvin B. Charne, Milwaukee, Wis., for the absent members of plaintiff classes.

L. C. Hammond, Jr., Ross R. Kinney and Patrick W. Schmidt, Milwaukee, Wis., for defendants.

Curry First, Milwaukee, Wis., for Milwaukee Teachers' Ed. Ass'n, undesignated intervenor.

## ORDER

REYNOLDS, Chief Judge.

On March 11, 1977, a hearing was held in the above-captioned action for the purpose of obtaining the oral views of counsel of record and the Special Master with respect to the question of the adoption of a final and comprehensive plan for the desegregation of the public schools of the City of Milwaukee, and to consider defendants' December 22, 1976, motion to reconsider desegregation guidelines and defendants' January 3, 1977, motion to approve the Milwaukee-*Austin* Plan, modify the guidelines referred to in the Court's order of June 11, 1976, and dissolve the injunction regarding the construction of Vincent High School.

At the outset of the hearing, the Court denied the defendants' motion to change desegregation guidelines and defendants' motion to approve the "Milwaukee Board of School Directors' Milwaukee-*Austin* Plan for the Desegregation of Court Determined Identifiable Constitutional Violations with Present Segregative Effects" ("Milwaukee-*Austin* Plan") for the reasons stated on the record in open court. The Court also advised the parties that it had independently assessed the record which has been compiled to date in this action and had concluded that the "Memorandum in Response to Court Order Requiring Defendants to Devise and Submit a Plan for Desegregating the Milwaukee Public School System by September 30, 1978" ("Blue Plan") does not constitute a meaningful response to the Court's orders. Accordingly, the Court rejected the Blue Plan. The Court further concluded that the Special Master's remedial recommendations would successfully accomplish the desegregation of the Milwaukee Public School System through means that were most appropriate to the circumstances of this particular action.

The Court thereafter solicited the oral views of counsel with respect to the various aspects of the Special Master's remedial recommendations. The Court has carefully considered those views and has determined that although it will adopt in large part the remedial recommendations of the Special Master, it is necessary that those recommendations be modified in certain respects.

IT IS THEREFORE ORDERED:

## 1. *Denial of Certain Motions*

The defendants' motion of December 22, 1976, seeking reconsideration of desegregation guidelines and the portions of the defendants' motion of January 3, 1977, requesting approval of the "Milwaukee-*Austin* Plan" and modification of the guidelines referred to in the Court's order of June 11, 1976, are denied.

## 2. *Rejection of Defendants' Remedial Plans*

The Court has found that the remedial actions set forth in the "Milwaukee Board of School Directors' Milwaukee-*Austin* Plan for the Desegregation of Court Determined Identifiable Constitutional Violations with Present Segregative Effects" and the "Memorandum in Response to Court Order Requiring Defendants to Devise and Submit a Plan for Desegregating the Milwaukee Public School System by September 30, 1978" will not effectively remedy the unlawful segregation which the Court has found to exist in the public schools of the City of Milwaukee. As the Court finds that these remedial plans are constitutionally inadequate, they are hereby rejected.

## 3. *Student Desegregation*

(a) Defendants shall immediately implement the policies and procedures relating to student assignment which are described in the appendix attached to this order, which appendix emanates from a document entitled "Comprehensive Plan for Increasing Educational Opportunities and Improving Racial Balance in the Milwaukee Public Schools." These policies and procedures (hereinafter referred to as "student assignment system") consist of a student assignment process and pupil transfer policy which are to be implemented in the context of a planning base which includes the identification of attendance areas for all students, the reorganization of grade level structures, the affiliation of schools into elementary school leagues and junior and senior high school associations, and the establishment of a feeder pattern system.

(b) Defendants shall administer the student assignment system with the goal of achieving results which are consistent with the requirements set forth in paragraphs 3(c) and 3(d) hereof.

(c) By September 30, 1978, and until this order shall expire as set forth in paragraph 7 below, at least two-thirds (⅔) of the schools in the Milwaukee Public School System should have student body populations that are between twenty-five and fifty percent (25–50%) black. Of the schools that remain, at least one-half (½) should have student body populations that are between twenty and sixty-five percent (20–65%) black, and the balance should have student body populations that are between fifteen and seventy-five percent (15–75%) black.

(d) In order to insure significant progress towards the requirement contained in paragraph 3(c) by September 30, 1977, at least two-thirds (⅔) of the schools in the Milwaukee Public School System should have student body populations that are between twenty-five and fifty percent (25–50%) black.

(e) If a "school within a school" is established, both the school as a whole and the "school within a school" shall be required to conform to the requirements of paragraphs 3(c) and 3(d).

(f) In calculating the racial composition of schools for purposes of determining compliance with the requirements of paragraphs 3(c) and 3(d), defendants shall exclude kindergarten and pre-kindergarten students, students in self-contained classrooms for the severely handicapped (also known as low incidence handicapped), and during the 1977–78 and 1978–79 school years only, students enrolled in their senior year of high school.

(g) For purposes of paragraphs 3(c) and 3(d), self-contained schools for the severely handicapped will be omitted from the numerical base of the total number of schools within the system, and such schools shall

not be subject to the requirements set forth herein.

(h) For purposes of paragraph 3(d), schools which will be closed during either the 1977–78 or 1978–79 school years as a consequence of final action of the defendants taken prior to May 1, 1977, will be excluded from the numerical base of the total number of schools within the system, and such schools shall not be subject to the requirements set forth herein.

(i) For purposes of paragraph 3(c), schools which will be closed during the 1978–79 school year as a consequence of final action of the defendants taken prior to May 1, 1978, will be excluded from the numerical base of the total number of schools within the system, and such schools shall not be subject to the requirements set forth therein.

■ (j) Nothing in this order is intended to prevent defendants from designating Hispanic students, native Americans, and other minority students as separate minority populations and according them priority over other non-black students in assignment to schools with programs designed to meet their special needs. Moreover, nothing in this order is intended to prevent the defendants from affording any student priority of assignment over other students of the same racial category (i. e., black or non-black) for reasons of educational needs or administrative convenience so long as that assignment is not inconsistent with this order.

(k) A status conference will be held on November 18, 1977, for the purpose of receiving reports from the Special Master and counsel of record as to the progress which has been achieved with respect to the implementation of, and compliance with, the student desegregation requirements set forth herein. At that time, the Court will consider whether it is necessary or desirable to modify or otherwise alter any of its outstanding orders in light of the results which have been experienced during the 1977–78 phase of the student desegregation process.

### 4. Faculty Desegregation

(a) Paragraph 1 of the Court's order of June 11, 1976, is hereby rescinded. Henceforth, all teacher vacancies will be filled in accordance with contractual provisions unless a transfer or new placement would not help to promote in the school in which the vacancy exists a racial percentage within five percentage points of the percentage of black teachers within the entire system. If excessing occurs, excessed teachers will be placed in accordance with the foregoing procedure. If the racial composition of excessed teachers, teachers returning from leave, or new teachers precludes adherence to the foregoing procedure, then they shall be placed in accordance with contractual provisions.

(b) For purposes of paragraph 4(a), the term "teacher" shall include any person contained in the teachers' bargaining unit which is recognized in the collective bargaining contract between the Board of School Directors of the City of Milwaukee and the undesignated intervenor, and who is assigned full time to one school.

(c) By September 30, 1978, at least two-thirds (⅔) of the schools in the Milwaukee Public School System should have teacher populations that are between eleven and twenty-one percent (11–21%) black. The remaining schools in the system should have teacher populations that are between six and twenty-six percent (6–26%) black as of that same date.

(d) In order to insure significant progress towards the requirement contained in paragraph 4(c) by September 30, 1977, at least one-half (½) of the schools in the Milwaukee Public School System should have teacher populations that are between eleven and twenty-one percent (11–21%) black, and at least one-sixth (⅙) of the schools should have teacher populations that are between six and twenty-six percent (6–26%) black.

(e) For purposes of paragraph 4(d), schools which will be closed during either the 1977–78 or 1978–79 school years as a consequence of final action of the defendants taken prior to May 1, 1977, will be excluded from the numerical base of the

total number of schools within the system, and the teachers assigned to such schools shall not be subject to the requirements set forth herein.

(f) For purposes of paragraph 4(c), schools which will be closed during the 1978–79 school year as a consequence of final action of the defendants taken prior to May 1, 1978, will be excluded from the numerical base of the total number of schools within the system, and the teachers assigned to such schools shall not be subject to the requirements set forth therein.

(g) The Special Master is directed to monitor the implementation of the teacher desegregation procedure set forth in paragraph 4(a). On or before June 15, 1977, he shall (i) report to the Court on the effectiveness of said procedure in achieving the goals set forth in paragraph 4(d); and (ii) in the event he concludes that substantial progress is not being made toward these goals, he shall inform the parties and propose to the Court an alternative procedure for teacher desegregation to insure the achievement of the goals stated in 4(d). If, however, he believes that such alternative procedure cannot be promptly implemented without causing significant disruption of the 1977–78 teacher assignment process, he shall delay its implementation until the 1978–79 school year.

(h) With respect to the assignment of principals, assistant principals, and assistants in administration who are assigned to particular schools, defendants shall take such steps as may be necessary to eliminate all consequences and vestiges of segregatory assignment policies previously practiced. At the status conference of November 18, 1977, defendants shall report to the Court with respect to the progress of their efforts in this regard.

### 5. Construction of Vincent High School

Defendants' motion filed on January 3, 1977, insofar as it relates to Vincent High School, is granted, and the injunction entered on June 9, 1976, and continued on July 9, 1976, which enjoined any activities relating to the construction of Vincent High School is hereby dissolved in light of the space requirements which will result from the adoption of the grade structure reorganization component of the student assignment system.

### 6. Desegregation Monitoring

The Special Master shall continue to perform the monitoring and evaluation responsibilities set forth in the Court's decision and order of January 19, 1976, and shall from time to time advise the Court and counsel of record as to defendants' progress toward achieving compliance with the requirements of this order. In the event the Special Master shall conclude that defendants are in compliance with this order as of December 31, 1978, the Special Master shall be relieved of his monitoring responsibilities in connection with this case.

### 7. Termination Date

Sections 3 and 4 of this order shall continue in full force and effect until December 31, 1980. At that time, sections 3 and 4 shall lapse and be of no further force and effect unless plaintiffs shall establish to the Court's satisfaction that this order has not successfully eliminated from the Milwaukee Public School System all of the consequences and vestiges of segregation previously practiced by the defendants.

### 8. Previous Orders

Previous orders of the Court inconsistent with this order are rescinded, and all others remain in full force and effect.

### 9. Final Order

This is a final order only with respect to establishing a desegregation remedy for the constitutional violations found by this Court on January 19, 1976, and directing its implementation. This Court is aware of The Emergency School Aid Act, 20 U.S.C. § 1601, et seq., and it has issued this order with an awareness of the requirements for receiving such federal aids.

APPENDIX

BUILDING THE PLANNING BASE

In designing a more stable planning base, such things as attendance areas, grade level organizations, and feeder patterns, have to be given serious attention. The stability of this planning base is essential to the proper articulation of a voluntary, choice assignment process. The importance of a stable planning base to the design of this plan will become more apparent as the details of the assignment process are explained.

Before any students can be assigned to any school there must be certain things known. In addition, the assignments for racial balance affect the way these required starting points must be designed. The four starting points preliminary to student assignments are:

1. An attendance area
2. Facts about facilities
3. A system of relating schools for racial balance purposes
4. A system of grade levels and feeder patterns that contribute to racial balance purposes.

*An Attendance Area*

There must be an attendance area and an attendance area school identified for all students at all levels. As a result of the action taken in the first phase of desegregation there are some nominal attendance area schools that do not in fact serve that purpose. For example, the Gifted and Talented Program at Fourth Street School does not serve a significant portion of its residential area students. Also, it could be envisioned that an entire school devoted to a Montessori specialty conceivably would not serve a significant portion of the attendance area population. Therefore, as a starting point prior to the process of student assignment it is important to assure every student of an attendance area school.

This point is critical for development of the proposed student assignment plan in that preference will be given the current residential population in attending an attendance area school when that population can be accommodated under racial balance requirements.

The Administration has determined what schools it would recommend as attendance area schools and those to become city-wide schools. Since there are relatively few city-wide schools, the redrawing of attendance areas is not extensive.

*Facts About Facilities*

The second point made with respect to starting points prior to student assignment is the importance of knowing certain facts about facilities. The most basic decision about facilities is whether they will exist as educational centers or not.

After it has been determined what school facilities there are open, then attendance area schools must be identified as one group and the city-wide schools as another. In the first phase of school racial balancing, the Administration declared a number of previous attendance area schools as zone-wide or city-wide specialties. In many cases, these programs (I.G.E. Multi-Unit, Open, Continuous Progress, and Fundamental) already existed in whole or in part somewhere in the system and the unique feature of the specialty was the drawing from various areas of the city. Since it was predetermined that these programs would be filled exclusively from a voluntary population it was necessary to go city-wide for the sake of trying to enroll the necessary number of students. Other programs, such as the Gifted and Talented or the Montessori Programs were clearly the type of program that should have been and were offered on a city-wide basis.

Another important aspect of facilities is in the determination of the desired size of the student body. This is normally referred to as capacity. Capacity, however, is variable rather than fixed. It is dependent upon the program being offered in the school. As well as a maximum, there is also a minimum student body size below which it is both inefficient and ineffective to operate the program.

For each facility the grade level organization needs to be known. The matter of grade level organization has received extensive study by a committee on the junior high, and also more recently by the planning councils, the Committee of 100, and the School Board's Instruction Committee, respectively.

When the various anomalies are disregarded, presently the Milwaukee Public Schools is offering two types of organization—one features a three-step process including a junior high or middle school structure; the other features a two-step process with the K–8 elementary school directly feeding the senior high school. Balancing the needs for stability and predictability with the desirable aspects of flexibility, the Administration has designed a grade level organization base that retains the two types of systems that interface logically with the proposed student assignment system. The two types of grade level organization being recommended are K–5, 6–8, 9–12, and K–8, 9–12.

The Administration's recommendation to phase into a K–5, 6–8, 9–12, or a K–8, 9–12 system is based on the best current information regarding the developmental needs of children, and also practical considerations pertaining to the interface of the grade level organization system and the parent choice system.

While no one grade level organizational plan can solve all problems confronting schools today, it is the belief of the Administration that the proposed reorganization has many more advantages than disadvantages. Some of these are appropriate to mention here.

The four-year high school, in particular, responds to a variety of concerns and problems that currently exist with the inclusion of grade nine in the junior high school. For instance, course work at grades 7 and 8 doesn't "count" toward high school graduation, while at 9th grade, all course work applies toward graduation; Carnegie units are awarded for 9th grade courses, but not for 7th or 8th grade courses; teacher certification and training is such that many junior high school teachers are able to teach grades 7 and 8, but not 9th and conversely. For the most part, today's 9th grade adolescent is socially, emotionally, and psychologically closer to his peers in grade 10 than those in grade 8; many 9th grade courses are the first of a sequence of courses which continue throughout high school and could be coordinated more effectively by having 9th grade in with the high school. Finally, the issue of equity in our 9th grade interscholastic athletic program would be more readily resolved under the 9–12 structure.

The middle school approach of including grades 6 through 8 has a number of advantages. Many of these have been implied above in the discussion of removing 9th grade from the junior high school. The Administration also feels that it is highly desirable for program continuity and for the students' stability to have at least a three-year program available for the pre and early adolescent. This, combined with the facilities available in the current junior high schools, would provide an excellent opportunity for a truly exploratory program to exist for students in these transitional years. Again, today's 6th graders are more closely compatible with their peers in grade 7 than in grade 5.

In summary, it is proposed to modify the grade level organization so that each high school will include grades 9 through 12 and that each middle school will include grades 6 through 8. The Administration believes, for the reasons listed above, these modifications will improve the educational program for Milwaukee Public Schools' students.

The parent choice system will call for school assignment decisions occurring at the beginning of the elementary school (primary program), after the 5th grade, and after the 8th grade. When schools do not have compatible grade level organizations, the choice system will not be able to operate in a fair and equitable manner. For example, if some high schools have a 9–12 structure but there are some 6–8 middle schools and other 7–9 junior high schools, then the 9th grade choice will result in some students going to a senior high school and other students remaining at the junior high level. At the

10th grade level, the 9th grade students assigned to a high school would have the advantage of staying in that high school over students attempting to come in from a junior high structure.

Largely because of the building program schedule for high schools, the 9–12 structure cannot be implemented in 1977 without overcrowding high school facilities. Therefore, we recommend the movement to a 9–12 system in 1978. Since Vincent High School will not be completed until 1979 at the earliest, the completion of student grade reorganization may be delayed until the opening of Vincent High School.

The need for additional, quality high school space even after the completion of North and South Division is not only the consequence of going to a 9–12 system, but also of the desire to hold high school enrollments to under 2,500 maximum per building. It has been the system's experience that smaller high schools are more manageable and desirable educational environments.

With completion of Vincent High School, the system will have the ability to accommodate a 9–12 structure, keep high schools under 2,500 students, and look to the future in phasing out certain aging high school facilities.

By going to a predominantly K–5 system at the elementary level, more additional classroom space is generated. This complements a long-term objective of closing a number of elementary schools. Most of the 25 schools built before 1900 are elementary schools.

Finally, under the necessary facts that must be known about facilities, it is important to identify any special criteria for admittance. In most cases this will not be a factor. However, when there are either academic, age, or prerequisite requirements that limit who can be admitted, these must be known before student assignments can be made.

### A System of Relating Schools for Racial Balance Purposes

Now that the attendance areas are established and the necessary decisions made about facilities, a system of relating schools for racial balance purposes can be established. Such a system was prefigured in the elementary league structure. One school assignment choice available to parents is an associated school in the league structure. An essential addition to the elementary school league structure is an associated arrangement for middle/junior high schools and high schools. An overlay upon this system is a choice to go to a city-wide school or another attendance area school outside the associated school arrangement. However, this latter movement, called transfer, would only take place after all basic assignments had been made.

### A System of Grade Levels and Feeder Patterns that Contribute to Racial Balance

Finally, after attendance areas, facilities, and school relationships for racial balance are known, the feeder pattern can be designed to make a predictable, progressive pattern of school assignment. As will later become apparent, it is critical to the success of the voluntary/choice system that grade level organizations and feeder patterns are coherent and reasonably stable over time.

After these starting points for student assignments have been designed, the existence of three overlay systems become evident. At the base is the attendance area system for elementary, middle, junior high, and senior high schools. Every child resides in an attendance area with an attendance area school.

Overlayed on the attendance area system is the associated school system. Because attendance areas are not racially balanced there must be an arrangement to bring racially isolated attendance areas together so that any one school enrollment can be racially balanced. Within the limits of racial balance many students can be accommodated in their attendance school; others, however, would have to attend associated or city-wide schools in order to have the enrollment in all schools conform to racial balance requirements.

In associating schools either at the elementary, middle, junior high, or senior high

school levels, the relationships provide for racial representation as a reflection of the geographic base, not as a reflection of the current enrollment in any particular school. Our present enrollment patterns reflect the legacy of open enrollment, and, more recently, racial balance reassignments. As new assignments grow out of the proposed student assignment procedures, the residential base will become a more influential factor.

This racial balance plan is designed to request of parents and students at critical, educational junctures (at the end of kindergarten, at the end of 5th grade, and 8th grade) certain decisions on school enrollment. There will be a regular feeder pattern that is established by the attendance area system, however, there is also the associated school system within which to assign students should the attendance area school not accommodate all of the students making that particular choice. However, at this point it is clearly recognized the importance of a uniform grade level organization so that students are making these choices at the same time periods and, therefore, giving students equal opportunity to have their choices honored.

### STUDENT ASSIGNMENT PROCESS

In the previous chapter the elements necessary for student assignment were identified as a planning base. It was necessary to have all those starting points clearly established before the first student could be assigned. It has been the premise of the Board and the Administration that the plan to achieve racial balance ought to exhaust the potential for voluntary movement in our system. Moreover, this voluntary movement was in the first phase and will continue in this comprehensive plan to be stimulated by educational incentives. However, in that middle ground between clear volunteerism and mandatory reassignment is that realm of "unexplored territory" called choice. Volunteerism is an aspect of choice—it is getting your first choice. However, there are choices other than your first choice that can be acceptable. There

is in this plan an opportunity for communication between parents and the school system regarding relative acceptability among various choices.

The student assignment procedures outlined below are based on the simple proposition of honoring as many first choices (operational definition of volunteerism) as possible within racial balance requirements, and then assigning students based on descending choice possibilities with the lowest ranking choice representing the operational definition of mandatory reassignment.

Should this assignment procedure be approved, the Administration would send to the parents of all students in the system and potential to the system a written set of assignment procedures. The essence of this communication will be the student assignment choice system. There are four choices that can be made. They are:

1. Enrollment in the attendance area or feeder pattern school (present)
2. Enrollment in another attendance area school (associated)
3. Enrollment in a specialty school or program
4. Enrollment in a suburban school under provisions of Chapter 220 (minority students only).

*First Student Assignment Period*

Parents will communicate back to the school system, their choices in priority order. These parent choices will be matched against the starting point information outlined in the previous chapter, and as many first choices as possible within racial balance requirements will be honored and the parent then informed of this firm assignment.

Recognizing that in all likelihood not all first choices can be honored within racial balance requirements, it will become necessary to look at parent choices ranked second or third, etc. The assignment procedure that would then progress through honoring as many second choices, third choices, etc., within racial balance requirements until all students had been assigned. These second

and third choices result in tentative assignments. The parent receives written confirmation of the tentative assignment but is also informed at this point that other choices are still available.

*Second. Student Assignment Period*

This occasions the beginning of the second assignment period. Those parents who are not satisfied with their student's tentative assignment may submit another request based on the openings available. Then the procedure of honoring first choice, second choice, etc., is repeated with the outcome this time being a firm assignment for all students. The second assignment period would occur sometime in May. During both the first and second assignment period, an over subscribed choice will be resolved through a random selection procedure. Finally, after all the assignment procedures have been completed, there remains the opportunity of a parent transferring to any school in the system where there is space and within the transfer requirements outlined in the next chapter.

*Additional Features of the Assignment Process*

Described above is the basic two step approach to student assignment that is designed to exhaust the potential of voluntary movement and also to give parents the opportunity to communicate other levels of choices. Many suggestions were made by Planning Council and Committee of 100 representatives, as well as the Special Master regarding other important elements of the assignment process. The inclusion of these elements in this section represents another attempt to make the student assignment process as equitable and reasonable as possible within the court requirements.

The first feature has to do with the establishment of a preference system. It is proposed that present attendance in a school or attendance feeder system be given preference within racial balance requirements. This would mean, for example, that when there is an oversubscription of a particular race student in a school, students presently attending the school would be enrolled before a student from another school. This is the same practice that existed last September. It should be noted, however, that present attendance in a school includes both the residential population and any population that has previously transferred into the school. Both populations have equal right of access to the school under this provision.

The second aspect of the preference feature is the desire to keep families together. Formated into the communication procedures from the parent to the school system will be the opportunity to indicate the desire to have family members together as students in one school. The family in such cases would become the sampling unit, not the individual student. It is also desirable to have peers together. The very design of this assignment procedure will have the effect of keeping peers together to a significant degree. This is brought about by the associating school procedures and also by the already well established informal procedure of having parents meeting together to make common choices for enrollment in other than the neighborhood school. It has been the case, and will undoubtedly continue to be the case, that most of these common enrollment choices can be honored if they are first choices and not the neighborhood school.

Finally, the Special Master and others have pointed out the importance of allowing students to finish for the coming year only their last year in a school. This can definitely be accommodated at the senior high school for 1977.

Another aspect of the preference feature has to do with the special case of transition from one level school to another; for example, the movement of students from an elementary open education program into Jackie Robinson. In some cases there are, or may be established, certain entrance requirements which can control the enrollment into subsequent specialty programs. There is also the possibility of either increasing or decreasing specialty school space dependent on the demand of the pro-

gram. However, when entrance requirements and space adjustments have been made and there remains oversubscription at the next school level, all eligible students will be given equal access.

Another kind of opportunity based on some of the known and predictable psychological consequences of the assignment system is being recommended.

It is proposed that students be guaranteed the opportunity to attend their attendance area school during one of three times in the feeder system (Elementary, middle junior high or high school). That is, the students who attended an associated school at the elementary level up until the 5th grade would then have an opportunity to attend either the middle junior high school or high school levels respectively in the attendance area school if that is their first choice. Those students who had already received their attendance school as a first choice or elected to attend a city-wide school would not have this same guarantee.

*1977 Versus 1978*

The racial balancing plan for 1977 and 1978 are initially controlled by the court order. The Administration recognizes the minimum requirement of at least two thirds of our schools to be racially balanced by September, 1977, and all schools to be racially balanced in 1978. The determination of which schools are to be racially balanced in 1977 versus 1978 is in turn controlled by other factors, the most significant one being school construction. The following recommendations are made with regard to 1977 versus 1978 activities:

1. In 1977 there will be a variety of grade level organizations at the elementary, middle, and senior high levels to be phased in toward the 1978 goal of having the system in a grade level organization of K–5, 6–8, 9–12, or K–8, 9–12.

2. Racial balancing efforts and the assignment process described in the previous pages will be applied at the elementary and middle junior high school levels (from lower primary up through and including grade 9 when it is in a junior high school). The assignment process will be applied to the high schools in 1978.

By racially balancing all the elementary and present middle junior high schools, the number of racially balanced schools will be in excess of the number required by the court order. The present racial balance in the high schools will be maintained or improved in 1977 based on the assignment procedures used this last September. In 1978, as the high schools move to a 9–12 structure and construction of North Division and South Division is completed, the assignment process used at the elementary and middle junior high school levels will apply to the senior high levels.

Another reason for exempting the high schools from the assignment process has to do with the nature of the process itself. In order to achieve stability and predictability, students are assigned into a school and then would have the opportunity of remaining until the last grade level is completed. If this were done in 1977 to all high schools, then in 1978 North and South Division would be completed, some students would have to be assigned again. Also the planning for King as a college preparatory school would benefit from an additional year of planning during which time needed school construction would take place in order to complement this program.

Finally, the completion of the desegregation process at the elementary and middle school levels will provide an orderly progression of initial integrated experiences at the lower age levels that will surely contribute to the successful racial balancing at the high school level. Since under the plan the present 8th graders and 9th graders would be racially balanced, (next year's 9th and 10th graders)

 that will provide a 50 percent racially balanced base upon which to build completely racially balanced high schools in 1978.

## One-on-One

The choice as to where their child will attend school is a very personal one made first by the parents in the child's early years and later, in many cases, by both the parents and the child for the secondary years. In recognition of that personal aspect of choice, the overriding concern in the student assignment process will be to communicate with parents and students on an individual, one-on-one basis.

The heart of the Phase II communications will be the activities that take place at the local school level. Here many persons will be mobilized by the principal to assist in the personal contact process including school staff members, the school's delegates to its planning counsel, PTA, and various parent group members, and other personnel resources at the school. It is very likely that persons from two or more schools will often work together on these personal contact activities.

A variety of occasions can be utilized in these activities including school open houses, parent-teacher conference day, family tours, coffee klatsches with the principal and parents, counseling sessions for parents and students, slide and videotape presentations with the possible use of films, plus home visits and the like. Local school ingenuity will add considerably to this list.

Essential to the success of this effort will be the establishment of numerical goals for each involved school. These goals will assist all participants in evaluating the success of the effort and, if necessary, evolving new strategies to foster the personal contact process.

It is contemplated that the parents of every student at the affected schools will at a certain point in time receive an envelope which will contain an explanation of the choices available for their child. Also included in the envelope will be a card on which the choices of the parents/students can be listed. This envelope and card procedure will be under the supervision of each local school rather than a mass distribution system organized at the central administration building. Again, a personalized approach is the overall goal and intent.

STUDENT TRANSFER

PUPIL TRANSFER POLICY

**Current Policy**

The parents or legal guardians of a pupil who is enrolled in the Milwaukee Public Schools, or the pupil if 18 or older, may request a transfer from a school in the district in which the pupil resides to another school in the city, subject to the provisions listed below.

A. Basic Conditions

A transfer permit may be granted by the Superintendent's Office under the following conditions:

1. That the parents, or pupil if older, assume(s) the responsibility for requesting a transfer by securing the appropriate form from a school or the Pupil Personnel office at the School Administration Building. The

**Recommended Pupil Transfer Policy**

The parents or legal guardians of a pupil who is enrolled in the Milwaukee Public Schools, or the pupil if 18 or older, may request a transfer from a school in the district in which the pupil resides to another school in the city, subject to the provisions listed below.

A. Basic Conditions

A transfer permit may be granted by the Superintendent's Office under the following conditions:

1. That the parents, or pupil if older, assume(s) the responsibility for requesting a transfer by securing the appropriate form from a school or the Pupil Personnel office at the School Administration

completed form should then be mailed to the Pupil Personnel office.

Building. The completed form should then be mailed to the Pupil Personnel office.

2. That the parents, or pupil if 18 or older, submit(s) the request for a transfer during the period set for the respective school year within which they wish to have the transfer take effect.

2. That the parents, or pupil if 18 or older, submit(s) the request for a transfer during the period set for the respective school year within which they wish to have the transfer take effect.

3. That transfer permits be granted where space is available at the appropriate grade level, according to the following guidelines:

a. That first priority in enrollment shall be reserved to all pupils who reside in the district and wish to attend their neighborhood school, when such attendance can be accommodated within integration requirements.

b. A majority pupil may be granted a transfer permit to any school which has a 30% or more minority pupil enrollment.

c. A minority pupil may be granted a transfer permit to any school which has a 70% or more majority pupil enrollment

d. Transfer permits will be issued for a new school year until the cut-off time set forth in the negotiated contracts with MPS employee groups.

3. That transfer permits be granted where space is available at the appropriate grade level, according to the following guidelines:

a. That first priority in enrollment shall be reserved to all pupils who reside in the district and wish to attend their attendance school, when such attendance can be accommodated within integration requirements.

b. A student may transfer from one school to another where space is available and the transfer would contribute to the racial balance in both the sending and the receiving school based upon the city-wide minority average for that school level.

c. Transfer permits will be issued for a new school year until the cut-off time set forth in the negotiated contracts with MPS employee groups.

4. That the parents accept full responsibility for the child's regular and punctual attendance and acceptable conduct in school.

4. That the parents accept full responsibility for the child's regular and punctual attendance and acceptable conduct in school.

5. That the parents are provided the child's transportation to and from school if qualifications of Chapter 220 are met. Otherwise, parents provide transportation.

5. That the parents are provided the child's transportation to and from school if qualifications of Chapter 220 are met. Otherwise, parents provide transportation.

6. That a random selection or lottery system be utilized when transfer applications for

6. That a random selection or lottery system be utilized when transfer applications for

| | |
|---|---|
| a given school exceed the number of spaces available at that school. | a given school exceed the number of spaces available at ·that school. |
| **B. Change of Residence** | **B. Change of Residence** |
| Following a change of the parent's (or pupil if age 18 or older) legal residence within the city, the following guidelines apply: | The guidelines for pupil attendance will be used to determine the school of attendance following a change of the parents' (or pupil if age 18 or older) legal residence within the city. |
| 1. A pupil may transfer to the school of his/her residential district at the time of the change of residence. | |
| 2. A pupil may, upon written request (by his/her parents if under 18), complete the school year in the school he/she has been attending without a transfer permit. | |
| 3. A transfer permit, subject to the provision of A (3) b and c above, will be required for a pupil to remain in a school outside of his/her residential district beyond the end of the school year within which the change of residence occurs. | |
| **C. Administration Transfers** | **C. Administrative Transfers** |
| The Superintendent of Schools may, for good and sufficient reason, make an administrative transfer or pupil assignment at any time subject to the provisions of A (3) b and c above. | The Superintendent of Schools may, for good and sufficient reason, make an administrative transfer or pupil assignment at any time subject to the provisions of A (3) b above. |
| **D. Duration of Transfers** | **D. Duration of Transfers** |
| Once a transfer permit has been issued by the Superintendent's office, it remains in effect without renewal unless a change of residence occurs or the permit is revoked. Pupils granted transfer permits beginning with the 1976-1977 school year will have the option of continuing in the feeder pattern of the schools they are attending. Once on transfer, a request to return to the school in the attendance area of residence must be processed under the procedures included in this pupil transfer policy. | Once a transfer permit has been issued by the Superintendent's office, it remains in effect without renewal unless a change of residence occurs or the permit is revoked. Pupils granted transfer permits beginning with the 1976-1977 school year will have the option of continuing in the feeder pattern of the schools they are attending. Once on transfer, a request to return to the school in the attendance area of residence must be processed under the procedures included in this pupil transfer policy. |
| **E. Conferences with Parents** | **E. Conferences with Parents** |
| Principals and other appropriate school personnel will provide all necessary and pertinent information required by a parent who is interested in taking advantage of the pupil transfer policy. No parent is to be discouraged from applying for a transfer permit. | Principals and other appropriate school personnel will provide all necessary and pertinent information required by a parent who is interested in taking advantage of the pupil transfer policy. No parent is to be discouraged from applying for a transfer permit. |

F. Appeals

An Administrative Committee, to be appointed by the Superintendent, will consider all cases where a parent, or pupil age 18 or older, might wish to appeal application of the "30% rule". The Administrative Committee would also make recommendations to the Superintendent concerning the revocation of transfer permits and the granting of transfers under unusual health, safety, or educational needs conditions. Membership of the committee would be representative of the ethnic and racial make-up of the Milwaukee Public Schools. All decisions by the Administrative Committee are to be governed by the Statement on Education and Human Rights adopted by the Board of School Directors on Sept. 2, 1975. .Documentation of each transfer granted under these conditions would be on file for public or court inspection.

G. Current Transfer Permits

All transfer permits in effect for the 1975-1976 school year continue to be honored during the 1976-1977 school year at the school for which issued.

H. Transportation Service

Transportation service will be provided in accordance with the levels of service contained in the Board Adopted Transportation Policy and State of Wisconsin, Chapter 220, transfer plans.

I. Policy Exclusions

This policy does not apply to students who avail themselves of the opportunities provided by High Schools Unlimited, Schools for the Transition, Options for Learning, exceptional education programs, and other city-wide, zone-wide, or suburban alternative programs.

F. Appeals

An Administrative Committee, to be appointed by the Superintendent, will consider all cases where a parent, or pupil age 18 or older, might wish to appeal a transfer denial. The Administrative Committee would also make recommendations to the Superintendent concerning the revocation of transfer permits and the granting of transfers under unusual health, safety, or educational needs conditions. Membership of the committee would be representative of the ethnic and racial make-up of the Milwaukee Public Schools. All decisions by the Administrative Committee are to be governed by the Statement on Education and Human Rights adopted by the Board of School Directors on September 2, 1975. Documentation of each transfer granted under these conditions would be on file for public or court inspection.

H. Transportation Service

Transportation service will be provided in accordance with the levels of service contained in the Board Adopted Transportation Policy and State of Wisconsin, Chapter 220, transfer plans.

I. Policy Exclusions

This policy does not apply to students who avail themselves of the opportunities provided by High Schools Unlimited, Schools for the Transition, Options for Learning, exceptional education programs, and other city-wide or suburban alternative programs.